UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

SCOTT MERRITT,

               Plaintiff,

     v.

PROTEOSTASIS THERAPEUTICS, INC.,
MEENU CHHABRA, JEFFERY W. KELLY,
DAVID ARKOWITZ, FRANKLIN M.
BERGER, BADRUL A. CHOWDHURY,
KIM C. DRAPKIN, and EMMANUEL
DULAC,

               Defendants.

---------------------------------------------------------

Case No._____

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

Plaintiff Scott Merritt ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.     This action is brought by Plaintiff against Proteostasis Therapeutics, Inc. ("Proteostasis" or the "Company") and the members of Proteostasis' Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Proteostasis will merge with Yumanity Therapeutics, Inc. ("Yumanity") through Proteostasis' wholly owned subsidiary, Pangolin Merger Sub ("Merger Sub") (the "Proposed Transaction").

2.     On August 24, 2020, Proteostasis and Yumanity issued a joint press release announcing that they had entered into an Agreement and Plan of Merger dated August 22, 2020 (as amended on November 6, 2020, the "Merger Agreement").  Under the terms of the Merger Agreement, Merger Sub will merge with and into Yumanity, with Yumanity surviving as a wholly owned subsidiary of Proteostasis.  Each share of Yumanity common stock will be converted into the right to receive a number of shares of Proteostasis common stock pursuant to an exchange ratio as set forth in the Merger Agreement.  Upon closing of the merger, Yumanity and Proteostasis stockholders will own approximately 70.9% and 29.1% of the combined company's common stock, respectively.

3.     Additionally, Proteostasis stockholders will receive one contingent value right ("CVR") entitling such holders to receive certain net proceeds, if any, derived from the grant, sale or transfer of rights of all or any part of Proteostasis' intellectual property relating to its cystic fibrosis clinical programs (the "CF Assets") completed prior to the effective time of the merger or during the nine-month period after the effective time.[1]

---

[1] According to the Proxy Statement (defined below):

> The net proceeds from a CF Asset Monetization will be split between the CVR Holders and Yumanity (as successor in interest to Proteostasis) depending on when a CF Asset Monetization closes: The CVR Holders will receive 100% of the net proceeds for a CF Asset Monetization transaction that closes prior to the Closing; 90% of the net proceeds for a CF Asset Monetization transaction that closes after the date of the Closing and on or prior to the three-month anniversary of the date of the Closing; 75% of the net proceeds for a CF Asset Monetization transaction that closes after the three-month anniversary of the date of the Closing and on or prior to the six-month anniversary of the date of the Closing; and 50% of the net proceeds for a CF Asset Monetization transaction that closes after the six-month anniversary of the date of the Closing and on or prior to the nine-month anniversary of the date of the Closing. The combined organization will receive the remainder of any net proceeds not distributed to the CVR Holders, as applicable.

Proxy Statement at 173.

4.     On November 12, 2020, Proteostasis filed a proxy statement/prospectus on Form 424B3 (the "Proxy Statement") with the SEC.  The Proxy Statement recommends that Proteostasis stockholders vote in favor of the Proposed Transaction, and is designed to provide all material information to permit Proteostasis stockholders to make an informed decision.

5.     In this regard, the United States Supreme Court has long stressed that §14(a) of the Exchange Act stems from a "congressional purpose of ensuring full and fair disclosure to shareholders" with respect to proxy statements in advance of a stockholder vote on a merger. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 381-82 (1970); *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964).  Thus "[a] proxy statement should honestly, openly and candidly state all the material facts, making no concealment of the purposes for the proposals it advocates.  Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed; the others were concealed." *Mendell v. Greenberg*, 927 F.2d 667, 670 (2d Cir. 1990) (reversing dismissal of §14(a) proxy claims), as corrected 938 F.2d 1528.

6.     Under these guidelines, when stockholders are forced to decide whether to accept certain value in a merger, there is no more material information than the corporation's projections. The key issue for the stockholders is whether accepting the consideration being offered in the merger is more favorable than remaining a shareholder and receiving the future expected returns of the company, and management's views of the future prospects of the Company is the key factor in this assessment.

7.     In cash-out mergers where stockholders receive a fixed amount of cash for each share that they hold, the question is limited to whether the per-share price is fair and reasonable in light of what stockholders are giving up.  In these situations, the target company's stockholders

are only concerned with the stand-alone projections of the target company.  In deals like the Proposed Transaction that involve an exchange of stock rather than payment of cash, and stockholders of the company being acquired will retain an interest in the newly-combined company, the projections and future prospects of the acquiring company become equally important.  Stockholders of target companies like Proteostasis need both pieces to adequately evaluate whether what they will receive in the proposed merger is a fair exchange for giving up their interest in the Company as a standalone entity.

8.      Here, the Proxy provides neither.  As described in more detail below, the Proxy omits or misrepresents material information concerning financial projections and future prospects of both Proteostasis and Yumanity.  These projections were prepared by management of the respective companies, relied upon by the board of directors of Proteostasis in deciding to enter into the Proposed Transaction, and provided to the Company's financial advisor, MTS Health Partners, L.P. ("MTS"), for use in its all-important valuation analyses that are summarized in the Proxy.  Stockholders of Proteostasis must have these very same projections relied upon by the Company's Board and bankers to evaluate whether the Proposed Transaction reflects adequate compensation.

9.      The materiality of the undisclosed projections is heightened by the inclusion of the CVR as a significant component of the merger compensation for Proteostasis stockholders.  The value of the CVR is dependent upon the net proceeds derived from the grant, sale or transfer of rights of all or any part of the Company's CF Assets.  Yet, the Proxy is devoid of any valuation information concerning the Company's CF Assets, including any projected revenue or other income streams that Proteostasis management anticipates from the CF Assets that would form the basis of such an analysis.  Thus, Proteostasis stockholders are equally in the dark about the

projected value of the additional CVR compensation as they are about the standalone and combined values of the two companies that will comprise the new surviving entity post-close.

10.     Finally, the Proxy is materially misleading regarding (i) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by MTS; and (ii) Company insiders' potential conflicts of interest.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Proteostasis stockholders need such information in order to make a fully informed decision whether to vote in favor of the Proposed Transaction.

11.     In short, unless remedied, Proteostasis' public stockholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

13.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendants are found or are inhabitants or transact business in this District.  Moreover, Proteostasis common stock trades on the NASDAQ Global Market, which is headquartered in this District, rendering venue in this District appropriate.

## THE PARTIES

15.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Proteostasis.

16.     Defendant Proteostasis is a Delaware corporation, with its principal executive offices located at 80 Guest Street, Suite 500, Boston, Massachusetts 02135.  Proteostasis is a clinical stage biopharmaceutical company developing small molecule therapeutics to treat cystic fibrosis ("CF") and other diseases caused by dysfunctional protein processing.  Proteostasis' common stock trades on the NASDAQ Global Market under the ticker symbol "PTI."

17.     Defendant Meenu Chhabra ("Chhabra") has been President, Chief Executive Officer ("CEO"), and a director of the Company since May 2014.

18.     Defendant Jeffery W. Kelly ("Kelly") is a co-founder of Proteostasis and has been a director of the Company since December 2006.  Defendant Kelly has also been a director of Yumanity since December 2014.

19.     Defendant David Arkowitz ("Arkowitz") has been a director of the Company since 2019.

20.     Defendant Franklin M. Berger ("Berger") has been Chairman of the Board since June 2019 and a director of the Company since February 2016.

21.     Defendant Badrul A. Chowdhury ("Chowdhury") has been a director of the Company since May 2019.

22.     Defendant Kim C. Drapkin ("Drapkin") has been a director of the Company since February 2019.

23.     Defendant Emmanuel Dulac ("Dulac") has been a director of the Company since February 2019.

24.     Defendants identified in paragraphs 11-17 are referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

25.     Yumanity is a clinical-stage biopharmaceutical company focused on the treatment of neurodegenerative diseases through its scientific foundation and drug discovery platform. Yumanity's most advanced product candidate, YTX-7739, is currently in Phase 1 clinical development for Parkinson's disease.  Yumanity's drug discovery platform allows it to rapidly screen for disease-modifying therapies to overcome toxicity of misfolded proteins in neurogenerative diseases.  Yumanity's pipeline consists of additional programs focused on Lewy body dementia, amyotrophic lateral sclerosis ("ALS"), and Alzheimer's disease.

26.     Merger Sub is a Delaware corporation and a wholly owned subsidiary of Proteostasis.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

27.     Proteostasis is a clinical stage biopharmaceutical company committed to the discovery and development of novel therapeutics to treat CF through theratyping, or the process of matching modulators to individual response to treatment regardless of CFTR mutations.  The Company's CF-focused pipeline consists of novel CF transmembrane conductance regulator ("CFTR") modulators including correctors, potentiators and amplifiers.  Upon discovery of

amplifiers, a novel class of CFTR modulators, Proteostasis utilized their novel mechanism of action as a drug screening tool and subsequently identified correctors and potentiators that the Company is now developing as combination therapies.

28.    In June 2020, Proteostasis announced results from in vitro studies evaluating the use of PTI-129 as a potential treatment for COVID-19.  PTI-129 is a pre-clinical, once-daily, oral small molecule identified through our Disease Relevant Translation ("DRT") platform and originally designed to treat protein misfolding disorders involving the unfolded protein response ("UPR").  In in vitro studies conducted at Calibr, the drug discovery division of Scripps Research, PTI-129 demonstrated the potential to reduce viral protein production in host cells by activating the adaptive branches of the UPR pathway and reducing the levels of misfolded cellular proteins.

29.    On August 6, 2020, the Company reported its second quarter 2020 financial results, including a net loss of approximately $8.9 million for the quarter, as compared to a net loss of $20.0 million for the same period in 2019.  Research and development expenses for the quarter were $4.6 million, as compared to $16.9 million for the same period in 2019.  Defendant Chhabra commented on the results, stating:

> The COVID-19 pandemic has highlighted the unmet needs of the CF community and reaffirmed our commitment to providing more treatment choices for people living with CF.  Our team continues to work tirelessly to advance our mission and we anticipate announcing data from the ex vivo portion of the CHOICES development program in the fourth quarter of 2020, and plan to move into the clinical portion by year-end.

**The Proposed Transaction**

30.    On August 24, 2020, Proteostasis and Yumanity issued a joint press release announcing the Proposed Transaction, which states, in relevant part:

> BOSTON, Mass. – August 24, 2020 – Yumanity Therapeutics and Proteostasis Therapeutics, Inc. (Nasdaq: PTI) today announced that the companies have entered into a definitive merger agreement.  The combined company, operating under the

name Yumanity Therapeutics, Inc., will leverage a common scientific expertise in the area of protein misfolding to advance Yumanity's pipeline of innovative, disease-modifying programs for neurodegenerative diseases.

Yumanity's first clinical-stage product candidate, YTX-7739, is currently in Phase 1 clinical development for the treatment and disease modification of Parkinson's disease. Yumanity is also advancing several additional candidates for other neurodegenerative disorders, including dementia with Lewy bodies, multi-system atrophy, amyotrophic lateral sclerosis (ALS or Lou Gehrig's disease), and frontotemporal lobar dementia (FTLD).

"The combination of PTI and Yumanity brings together two technologies rooted in a shared scientific legacy of protein misfolding as the basis of disease, as well as capabilities and resources that offer shareholders a broad platform for value creation," commented Meenu Chhabra, President and Chief Executive Officer of PTI. "We believe the combined company is well-positioned to advance multiple programs into and through the clinic, including Yumanity's lead candidate YTX-7739, currently in Phase 1 trials for the treatment of Parkinson's disease. We are excited to be working with Yumanity's management team and leading investors to complete the merger."

Yumanity has raised more than $100 million from leading investors that include Alexandria Venture Investments, Biogen, Fidelity, Merck, Pfizer, Redmile Group, and Sanofi Ventures. The Company also recently entered into a strategic research collaboration with Merck (known as MSD outside the United States and Canada) for the discovery and development of novel agents for the treatment of ALS and FTLD with Yumanity eligible to receive future payments totaling approximately $500 million in addition to royalties on the net sales of any marketed products. Upon the anticipated closing of the merger between PTI and Yumanity, Richard Peters, M.D., Ph.D., President, Chief Executive Officer and Director of Yumanity, will become President, Chief Executive Officer and Director of the combined company.

"Yumanity's state-of-the-art R&D efforts and deep insights into new potential targets to treat neurodegenerative diseases places us on a rapid trajectory toward our goal of revolutionizing the treatment of these disorders. Our merger with PTI should enable the combined company to grow faster, deliver potential therapies to patients more quickly and create sustainable shareholder value well beyond what either of us would achieve separately," said Dr. Peters. "We have made significant clinical and business progress over the past several months, including our recent strategic research collaboration with Merck and our Series C financing. This merger also ensures that we have access to the additional capital we will need to advance our pipeline of disease-modifying therapies."

"Today's announcement brings together two organizations that share a common scientific heritage in the science of protein misfolding and brings that science one

step closer to novel solutions for patients suffering from the debilitation of neurodegenerative diseases," said Tony Coles, M.D., Chairman and Co-founder of Yumanity Therapeutics.  "We look forward to continuing this important clinical work on behalf of patients as we make this transition to becoming a public company."

**Proteostasis' Cystic Fibrosis (CF) Program Update**

PTI also announced today that it is pursuing a strategic transaction related to its proprietary CFTR modulators. PTI plans to share proceeds from any monetization of its CF assets through contingent value rights (CVR).  PTI stockholders of record as of the close of the merger would receive a portion of any upfront payment and CVRs entitling the holders to all net proceeds from any future milestones derived from the grant, sale or transfer of rights by PTI through a transaction completed from now until the closing of the merger.  PTI stockholders of record would also be entitled to a portion of any net proceeds from a transaction completed within nine months of the closing of merger. In addition to the merger agreement, a form of the CVR agreement outlining the mechanism for distributing of any such proceeds to legacy PTI holders will be filed with the U.S. Securities and Exchange Commission on Form 8-K.

PTI's CFTR modulators are currently being studied as part of the CHOICES development program. 502 subjects have completed enrollment in the organoid portion of the study, with data expected in the fourth quarter of 2020.

"We believe that our CF drug candidates have the highest probability of reaching patients in the hands of a pharmaceutical company with global development and commercialization capabilities that shares our vision of empowering the global CF patient community with more treatment options is realized," said Ms. Chhabra.  "It has been an honor to serve the CF community in the fight to bring new treatment options to patients and their families."

**About the Proposed Merger**

Under the terms of the merger agreement, PTI will acquire all outstanding shares of Yumanity in exchange for newly-issued shares of PTI common stock.  Upon completion of the proposed acquisition, it is anticipated that existing PTI shareholders will own approximately 32.5% of the combined company and Yumanity shareholders will own approximately 67.5% of the combined company. The actual allocation will be subject to adjustment based on each company's outstanding equity ownership and Proteostasis' net cash balance at the time of closing of the merger.  Following completion of the merger, the Yumanity Board of Directors will be expanded to nine persons to include the appointment of two current Proteostasis directors.  The existing Yumanity Directors will continue to serve in their current positions and Dr. Coles will remain as chairperson.

The transaction has been approved by the boards of directors of both companies. The merger is expected to close in the fourth quarter of 2020, subject to customary closing conditions, including approval of the merger by the shareholders of PTI. The combined company is expected to trade on the NASDAQ Global Market under the ticker symbol YMTX.

In conjunction with this merger announcement, PTI has reduced its workforce by 79%. As of today, PTI has five full time employees supporting the proposed merger transaction and strategic efforts related to PTI's CF assets.

**Insiders' Interests in the Proposed Transaction**

31.    Proteostasis insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Proteostasis.

32.    Notably, certain Company insiders will secure positions for themselves with the combined company. For example, the Merger Agreement provides that defendant Kelly, who currently serves on the boards of both Proteostasis and Yumanity, and defendants Arkowitz and Drapkin will serve on the combined company's board of directors.

33.    Moreover, the Company's executive officers and three additional Proteostasis employees stand to receive retention awards in connection with the Proposed Transaction. For example, defendant Chhabra is expected to receive $283,290 and Marija Zecevic, Proteostasis' Chief Commercial Officer, is expected to receive $152,880.

**The Proxy Statement Contains Material Misstatements and Omissions**

34.    The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Proteostasis' stockholders. The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote their shares in favor of the Proposed Transaction.

35.     Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Proteostasis and Yumanity management's financial projections; (ii) the data and inputs underlying the financial valuation analyses performed by the Company's financial advisor MTS; and (iii) Company insiders' potential conflicts of interest.   Accordingly, Proteostasis stockholders are being asked to vote in favor of the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Proteostasis and Yumanity Management's Financial Projections***

36.     The Proxy Statement is materially deficient because it fails to disclose material information relating to Proteostasis and Yumanity management's financial projections.

37.     For example, the Proxy Statement sets forth:

In the course of performing its review and analyses for rendering the opinion described above, MTS:

\* \* \*

(iii) reviewed certain internal financial analyses and forecasts relating to Proteostasis' business prepared by and provided to MTS by the management of Proteostasis (the "Proteostasis Projections"), and certain internal financial analyses and forecasts relating to Yumanity's business prepared by and provided to MTS by the management of Proteostasis (the "Adjusted Yumanity Projections" and, together with the Proteostasis Projections, the "Projections"), which Adjusted Yumanity Projections reflected adjustments made by the management of Proteostasis to certain financial analyses and forecasts provided by Yumanity to Proteostasis;

*Id.* at 122-23.  The Proxy Statement, however, fails to disclose the Proteostasis Projections relied upon by MTS for its analyses.

38.     Moreover, the Proxy Statement fails to disclose the value of the Company's CF Assets.  This is material to Proteostasis stockholders' decision to approve the Proposed Transaction

as the CF Assets will form the basis of any additional consideration the Company's stockholders will receive in connection with the CVR.

39.     With respect to the Unadjusted Yumanity Projections, the Proxy Statement fails to disclose unlevered free cash flows, and with respect to both the Unadjusted and Adjusted Yumanity Projections, the Proxy Statement fails to disclose all line items underlying the calculation of gross profit, operating income, and unlevered free cash flows.

40.     The omission of this information renders the statements in the "Opinion of Proteostasis' Financial Advisor" and "Financial Projections Used in Connection with the MTS Opinion" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning MTS' Financial Analyses***

41.     The Proxy Statement fails to disclose material information concerning the data and inputs underlying the financial valuation analyses performed by the Company's financial advisor, MTS.

42.     The Proxy Statement describes MTS' fairness opinion and the various valuation analyses performed in support of its opinion.  However, the description of MTS' fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Proteostasis' public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on MTS' fairness opinion in determining whether to vote in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Proteostasis' stockholders.

43.     With respect to MTS' *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the unlevered free cash flows (defined as earnings before interest and taxes, less income tax expense, less changes in net working capital) utilized in the analysis;[2] (ii) quantification of the inputs and assumptions underlying the discount rates ranging from 12% to 16%; and (iii) MTS' basis for assuming no terminal value.

44.     With respect to MTS' *Public Trading Comparable Companies Analysis*, the Proxy Statement fails to disclose the fully diluted outstanding shares and total cash and cash equivalents of each company observed in the analysis

45.     The omission of this information renders the statements in the "Opinion of Proteostasis' Financial Advisor" and "Financial Projections Used in Connection with the MTS Opinion" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Company Insiders' Potential Conflicts of Interest***

46.     The Proxy Statement omits material information concerning Company insiders' potential conflicts of interest.

47.     The Proxy Statement sets forth that:

The Proteostasis Transaction Committee of the Proteostasis board of directors approved a Key Employee Retention Program (the "Retention Program"), pursuant to which the remaining five Proteostasis employees, including Ms. Chhabra and Dr. Zecevic, will receive one-time retention incentive awards (the "Retention Awards"). The purpose of the Retention Awards is to ensure the retention and continued focus of these employees, both during the pendency of and following the Closing of the Merger. The Retention Awards amounts for Ms. Chhabra and Dr. Zecevic are listed below.

| Name | Title | Retention Amount |
|---|---|---|
| Meenu Chhabra | Proteostasis President, Chief Executive Officer and Interim Principal Financial Officer | $283,290 |
| Marija Zecevic, Ph.D. | Proteostasis Chief Commercial Officer | $152,880 |

---

[2] The unlevered free cash flows set forth on page 131-132 of the Proxy Statement are defined as operating income less taxes less change in working capital. *Id.*

> The Retention Awards will vest and be paid immediately prior to the Closing of the Merger, and either be paid in cash or settled with a RSU award with an equivalent cash value, in the Proteostasis board of director's sole discretion. The Retention Awards are subject to the employee, including Ms. Chhabra and Dr. Zecevic, executing a retention agreement in a form acceptable to the Transaction Committee.

*Id.* at 136.  The Proxy Statement, however, fails to disclose the identities of the other employees that stand to receive retention awards, as well as the amount of the award that those employees stand to receive.

48.     The omission of this information renders the statements in the "Interests of the Proteostasis Directors and Executive Officers in the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

49.     The Individual Defendants were aware of their duty to disclose the above-referenced omitted information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other stockholders of Proteostasis will be unable to make a sufficiently informed voting decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### <u>COUNT I</u>

**Claims Against All Defendants for Violations of Section 14(a) of the
Exchange Act and Rule 14a-9 Promulgated Thereunder**

50.     Plaintiff repeats all previous allegations as if set forth in full.

51.     During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the

statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

52.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about Proteostasis and Yumanity management's financial projections, the data and inputs underlying MTS's financial analyses, and Company insiders' potential conflicts of interest.  The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

53.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.

54.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

55.     Because of the false and misleading statements in the Proxy Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Claims Against the Individual Defendants for Violations
### of Section 20(a) of the Exchange Act

56.     Plaintiff repeats all previous allegations as if set forth in full.

57.     The Individual Defendants acted as controlling persons of Proteostasis within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Proteostasis, and participation in and/or awareness of the Company's

operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

58.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy Statement.

60.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

61.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

62.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their

positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, Proteostasis stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Proteostasis, and against defendants, as follows:

A.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Proteostasis stockholders;

B.    In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.    Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

D.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated:  December 6, 2020                    **WEISSLAW LLP**

                                    By _____
                                        Richard A. Acocelli
                                        1500 Broadway, 16th Floor
                                        New York, New York 10036
                                        Tel: (212) 682-3025
                                        Fax: (212) 682-3010
                                        Email: racocelli@weisslawllp.com

                                        *Attorneys for Plaintiff*